# Exhibit B

## MEMO ENDORSED



**ANDREWS**
ATTORNEYS **KURTH** LLP

450 Lexington Avenue
New York, NY 10017
212.850.2800 Phone
212.850.2929 Fax
andrewskurth.com

Lynn E. Judell
212 850.2854 Phone
lynnjudell@andrewskurth.com

May 17, 2006

**BY E-MAIL**

Valerie Morrison, Esq.
Wiley Rein & Fielding LLP
7925 Jones Branch Drive
McLean, VA 22102

Re:  *Wells Fargo Bank, N.A. v. Grand Star, LLC, et al.*
     Case No. 06 Civ. 3411 (RCC)

Dear Valerie:

    Thank you for the settlement proposal on behalf of Hardee's Food Systems, Inc. ("HFS") set forth in Thomas Lowther's May 11, 2006 letter to me and Gary Miller (the "May 11 letter").

    On behalf of Wells Fargo Bank, N.A. as Special Servicer for LaSalle Bank, National Association, as Indenture Trustee for the Holders of MSDWMC Owner Trust 2001-F1 Notes, Participating Interests and Owner Trust Certificates, and as MSMC Loan Special Servicer for LaSalle Bank, National Association, as Indenture Trustee for the Holders of MSDWMC Owner Trust 2003-F1 Notes, Participating Interests and Owner Trust Certificates ("Lender"), we have been authorized to convey the following agreement in connection with that certain action filed in the United States District Court of the Southern District of New York (the "Court") in Case No. 06 CV 3411 (RCC).

    As an initial matter, Lender disputes many of the factual statements made in the May 11 letter concerning the facts surrounding the loan made by Lender to Grand Star LLC and Grand Star Realty, LLC (collectively, "Grand Star"), and the related franchise agreements. We will not refute or even address those statements in this letter. However, please be advised that the Lender reserve all rights in connection with those statements.

    For purposes of settlement, Lender agrees to the framework set forth in the May 11 letter, which proposes to distinguish leasehold sites from fee properties.

Valerie Morrison, Esq.
May 17, 2006
Page 2

1. **Leasehold Sites** (A list of the Leasehold Sites and Fee Sites will be exchanged by the parties within five (5) days of the date hereof.

Upon Lender's receipt of payment in cash of $2,400,000.00 from HFS, Lender will release all of its liens and security interests to the leasehold sites (collectively, the "Leasehold Sites"), the related leases, subleases, and sub-subleases, any furniture, fixtures, inventory, equipment and other personal property located at any of such Leasehold Sites, and the HFS franchise agreements previously or hereafter applicable to any of such Leasehold Sites, excepting: (i) the rights to the consideration paid pursuant to this agreement, (ii) any liens and security interests of Lender in and to all interest, income, dividends, distributions, revenues, profits and earnings thereon or other monies or revenues derived there from, including any monies payable to Grand Star in connection with any disposition of any Principal Agreement (as such term is defined in the Lender's loan documents) and all moneys which may become payable or received under any policy insuring the Collateral (as such term is defined in the Lender's loan documents) or otherwise required to be maintained under the Security Agreement part of the Lender's loan documents (including return of unearned premium), that arise or are received prior to midnight on May 17, 2006 or such other date as mutually agreed to between Lender and HFS (the "Closing"), and (iii) all cash, security deposits (except for lease security deposits with landlords), credit card receipts or other payment intangibles, that arise, are in place and/or are received prior to Closing, the items contained in subparagraphs (ii) and (iii) herein collectively called "Collateral Revenues." Wells Fargo consents to HFS taking over operations of the restaurants at the Leasehold Sites effective midnight on May 17, 2006, subject to the provisions of this agreement.

If there is any equipment formerly owned by Grand Star at any Leasehold Site necessary to the operation of a Fee Site, Lender shall have the right to remove the equipment, unless the equipment is (i) necessary or desirable for the operation, reletting or turning over of any of the Leasehold Sites to the prime landlord or (ii) affixed to the Leasehold Site in a manner such that removal will cause material damage to the Leasehold Site. In case of (i) or (ii), the parties agree to cooperate to resolve that issue. Any such removal shall be at the sole cost and expense of the Receivership Estate (defined below), which cost and expense shall include the cost of repairing damage to the applicable Leasehold Site caused by such removal. Lender may remove POS equipment from Leasehold Sites as and when replaced by HFS if necessary to the Receiver's operation of a fee site.

2. **Fee Sites**

(a) **Marketing the Fee Sites**

Upon the release of the Lender liens in subparagraph 1 of this agreement above, HFS releases Lender and Lender releases HFS from any and all claims, counterclaims, demands, actions, causes of action, suits, debts, damages, liabilities, losses, penalties, dues, sums of money, accounts, agreements, and obligations of any type whatsoever, in law or equity, whether

Valerie Morrison, Esq.
May 17, 2006
Page 3

known or unknown, arising from actions, inactions or circumstances occurring prior to the date of this agreement, except those created or preserved pursuant to this agreement.

For a period ending December 31, 2006, ("HFS Sale Period"), Lender consents to HFS having the exclusive right (subject to the terms of this agreement) to actively market the fee properties subject to the Lender's liens and security interests (collectively, the "Fee Sites") to HFS franchisees for terms of sale reasonably acceptable to HFS and Lender and as customary in the markets where such sales are to take place, provided however, that the net sales proceeds to Lender for any Fee Site to be sold shall be, at minimum, for a certain amount as shall be agreed to by HFS and Lender in advance of any sale of the Fee Sites (the "Base Amount"), and such sales shall be closed with and through a title company chosen by Lender (with the proceeds of sale to be escrowed with such title company pursuant to an escrow agreement acceptable to Lender). Lender agrees to provide its proposed Base Amount for the Fee Sites to HFS within 10 days from the date of its release of Lender liens in subparagraph 1.

The Base Amount will not be disclosed to any party other than HFS, the Lender and the Receiver, including but not limited to prospective purchasers or lenders.

Nothing herein shall prevent the Lender, in its sole and absolute discretion, from agreeing to sell a Fee Site for less than the Base Amount.

During the HFS Sale Period, Lender agrees not to actively market or advertise the Fee Sites for sale to any third party. Notwithstanding the foregoing, nothing herein shall prevent the Lender or Receiver from considering unsolicited offers to purchase one or more Fee Sites during the HFS Sale Period ("Third Party Offer"). If Lender and/or Receiver receives a Third Party Offer for a total amount in excess of the Base Amount for such properties, and HFS does not have such Fee Sites under a signed contract for sale as approved by Lender, Receiver (or its designee) shall have the right to proceed with the sale(s) that are the subject of such Third Party Offer, provided however that nothing in this agreement shall be deemed to be a waiver by HFS of its right to enforce restrictions on sales to a competitor, if any, contained in the deeds. Subject to any confidentiality requirements of such Third Party Offer, Lender or Receiver receiving such Third Party Offer shall use reasonable efforts to provide a copy of such Third Party Offer to HFS. In the event of any such sale by Receiver to a noncompetitor of HFS, HFS agrees, upon the written request of Lender, to execute a written recordable waiver agreement in form and substance acceptable to the title company providing title insurance to the applicable purchaser ("Waiver Agreement"), waiving any and all restrictive covenants for any of the such Fee Sites to be sold contained in any deed or in any franchise agreement, including, without limitation, any use, purchase and non compete covenants and restrictions (collectively, "Covenants and Restrictions"). Nothing contained herein shall be deemed to be an agreement by Lender or Receiver that said Covenants or Restrictions are valid and/or enforceable.

If HFS decides that it is not going to actively market one or more of the Fee Sites during the HFS Sale Period, it shall so notify Lender, and Lender (or its designee) will have the option to actively market and advertise the Fee Sites for sale to any party. In such event, HFS agrees to execute the Waiver Agreement.

Valerie Morrison, Esq.
May 17, 2006
Page 4

        Upon the expiration of the Hardee's Sales Period, or upon written notification by HFS to Lender that HFS has ceased active marketing of the Fee Sites, Lender (or its designee) shall have the right to actively market and advertise the Fee Sites for sale to any party, and HFS agrees to execute the Waiver Agreement.

        Lender will not pay any commission or other compensation to HFS and/or any real estate broker or any other entity that advertises and/or markets the Fee Sites on behalf of HFS. In addition, the Lender will not provide any financing in connection with the sale of any of the Fee Sites.

        Upon Lender's receipt of the full net sales proceeds in cash for the sale of any the Fee Sites on the date of closing thereof, for an amount equal to or greater than the Base Amount, Lender will, upon closing of such sale, release its liens and security interests relating to the Fee Sites sold, excepting the Collateral Revenues.

    (b)    **Operation and Management of the Fee Sites**.

        Lender and HFS consent to the immediate appointment of William J. Hoffman as Receiver to operate the Fee Sites and any Collateral not released pursuant to subparagraph 1 above in a receivership (the "Receivership Estate"). Upon the Receiver's appointment, HFS grants the Receiver a limited license to operate the Fee Sites as "Hardee's" restaurants until July 15, 2007, unless earlier terminated pursuant to the terms of this agreement. The terms of the limited license shall be set forth in a temporary license agreement to be executed by the receiver within ten days after authorization from the court. The temporary license agreement shall not include any Covenants and Restrictions and shall be subject to the approval of Wells Fargo and the Receiver. The Receiver will be permitted to operate the Fee Sites as Hardee's restaurants during such 10 day period, subject to the general operating requirements of HFS.

    (i)    Notwithstanding any other provision herein, for any Fee Sites the Receiver elects to operate as a "Hardee's" restaurant, Receiver shall operate such Fee Sites in accordance with standards, policies and procedures set forth in the temporary license agreement and the Hardee's Operations Manual (collectively, "Policies and Procedures") as such Policies and Procedures are applicable with respect to the operations of the restaurants while they are being operated as "Hardee's" restaurants. Such Policies and Procedures shall not include any Covenants and Restrictions and shall be modified as set forth in this agreement.

    (ii)    For any Fee Sites that Receiver elects to operate as "Hardee's" restaurants, Receiver shall pay to HFS the standard advertising and royalty fees (or such reduced fees as HFS may agree to in its sole discretion) for such Fee Sites for so long as the Receiver operates such restaurants.

    (iii)    In no event shall the Receiver be obligated to pay any past due amounts owed by Grand Star or be required to make any improvements or upgrades of any of the Fee Sites, but the Receiver shall be required to perform necessary repairs and maintenance at any operating Hardee's restaurant at a Fee Site.

Valerie Morrison, Esq.
May 17, 2006
Page 5

        (iv)    HFS shall have the right to terminate the temporary license if the Receiver fails to cure a monetary default under such temporary license within ten (10) days after written notice thereof from HFS to Lender and Receiver. HFS shall have the right to terminate the temporary license with respect to an "Affected Fee Site" if the Receiver fails to cure a non-monetary default under such temporary license with respect to a Fee Site (the "Affected Fee Site") within thirty (30) days after written notice thereof from HFS to Lender and Receiver, provided that with respect to such non-monetary default, if such default is not curable within such thirty (30) day period, such cure period shall be extended and continue for so long as Receiver is diligently pursuing the cure of same.

        Notwithstanding anything contained in this agreement to the contrary, the Receiver shall not be required to keep any Fee Site open and operating. However, in the event the Receiver, with the agreement of the Lender, decides to close a Fee Site, the Receiver shall provide HFS advance written notice of the intended closure.

        In the event that a Fee Site is closed by the Receiver, the Receiver agrees to give HFS access to "de-identify" the Fee Site(s) at HFS' expense (including the cost of repairs if any necessitated by the de-identification) by removing any personal property reasonably necessary to remove the name "Hardee's" or other Hardee's marks, and by returning any Hardee's operating manuals to HFS, all of which shall be deemed to be the property of HFS free and clear of Lender's liens and security interests.

        If a Fee Site(s) is under contract to be sold to an HFS franchisee during the HFS Sale Period, the Receiver will operate the Fee Site(s) in accordance with the terms of the approved sale contract.

        3.    **Mutual Releases**

        Upon the final sale of the last remaining Fee Site, Lender and HFS shall execute mutual limited releases, relating to Grand Star matters.

        The terms and conditions of this agreement shall become effective upon entry of an order approving this agreement in its entirety by the Court.

        4.    **Payroll and Other Obligations of Grand Star Arising Prior to Closing**

        The parties acknowledge that Grand Star conditioned its consent to the appointment of a receiver on the resolution of certain issues. Wells Fargo and HFS have not reached any agreement or understanding with respect to the issues raised by Grand Star.

Valerie Morrison, Esq.
May 17, 2006
Page 6

Very truly yours,

*Lyn E. Judell*
Lyn E. Judell

Agreed:

WELLS FARGO BANK, N.A. AS SPECIAL SERVICER FOR LASALLE BANK, NATIONAL ASSOCIATION, AS INDENTURE TRUSTEE

By: _____
Name _____
Its: _____

HARDEE'S FOOD SYSTEMS, INC. AND FLAGSTAR ENTERPRISES, INC.

By: _____
William R. Werner
General Counsel and Senior Vice President

cc: Gary C. Miller, Esq.
Peter Klarfeld, Esq.
William Werner, Esq.

Valerie Morrison, Esq.
May 17, 2006
Page 6

                                              Very truly yours,

                                              Lynn E. Judell

Agreed:

WELLS FARGO BANK, N.A. AS SPECIAL SERVICER FOR LASALLE BANK, NATIONAL ASSOCIATION, AS INDENTURE TRUSTEE

By: _____
Name: James Kendrick Noble III
Its: Managing Director

HARDEE'S FOOD SYSTEMS, INC. AND FLAGSTAR ENTERPRISES, INC.

By: _____
William R. Werner
General Counsel and Senior Vice President

cc: Gary C. Miller, Esq.
    Peter Klarfeld, Esq.
    William Werner, Esq.

NYC:131596.5

Valerie Morrison, Esq.
May 17, 2006
Page 6

Very truly yours,

Lynn E. Judell

Agreed:

WELLS FARGO BANK, N.A. AS SPECIAL SERVICER FOR LASALLE BANK, NATIONAL ASSOCIATION, AS INDENTURE TRUSTEE

By: _____
Name _____
Its: _____

HARDEE'S FOOD SYSTEMS, INC. AND FLAGSTAR ENTERPRISES, INC.

By: _____
William R. Werner
General Counsel and Senior Vice President

cc: Gary C. Miller, Esq.
    Peter Klarfeld, Esq.
    William Werner, Esq.

The Court is satisfied that this letter agreement by its terms resolves Plaintiff's motion for the appointment of a receiver and that such motion is now moot.

So ordered: May 17, 2006

_____
Richard Conway Casey, U.S.D.J.

NYC:151596.5